AO 106A  (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

~~FILED~~

UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

for the

District of New Mexico

DEC 2 2 2022

MITCHELL R. ELFERS
CLERK OF COURT

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
IN THE MATTER OF THE SEARCH FOR
INFORMATION DESCRIBED IN ATTACHMENT A THAT
IS STORED AT PREMISES CONTROLLED BY
GOOGLE LLC

)
)
)
)
)
)

Case No. 22-1901 MR

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A.

located in the _____Northern_____ District of _____California or elsewhere_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g) | Prohibited person in possession of a firearm and/or ammunition |

The application is based on these facts:
See Attachment C.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Armida Maria Macmanus, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__Sworn telephonically and signed remotely__ *(specify reliable electronic means)*.

Date: 12-22-2022

_____
*Judge's signature*

City and state: Las Cruces, New Mexico

Kevin R. Sweazea, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to information associated with sanchezchris2626@gmail.com, IMEI 355541825974466, and IMEI 35554182597446X, with X representing any digit from 0 to 9, ("the Accounts") that is stored at premises owned, maintained, controlled, or operated by Google LLC, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be disclosed by Google LLC ("Google")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Google, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Google is required to disclose to the government for each account or identifiers listed in Attachment A, the following information from April 8, 2022 to April 20, 2022, unless otherwise indicated:

    a.    All business records and subscriber information, in any form kept, pertaining to the Accounts, including:

        1.    Names (including subscriber names, user names, and screen names);

        2.    Addresses (including mailing addresses, residential addresses, business addresses, and email addresses, including alternate and recovery email addresses);

        3.    Telephone numbers, including SMS recovery and alternate sign-in numbers;

        4.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions, including log-in IP addresses;

        5.    Telephone or instrument numbers or other subscriber numbers or identities, including any temporarily assigned network address, SMS recovery numbers, Google Voice numbers, and alternate sign-in numbers

        6.    Length of service (including start date and creation IP) and types of service utilized;

        7.    Means and source of payment (including any credit card or bank account number); and

        8.    Change history.

b.      All device information associated with the Accounts, including but not limited to, manufacture names, model numbers, serial number, media access control (MAC) addresses, international mobile equipment identifier (IMEI) numbers, FCC ID numbers, Android IDs, and telephone numbers;

c.      Records of user activity for each connection made to or from the Accounts, including, for all Google services, the date, time, length, and method of connection, data transfer volume, usernames, source and destination IP address, name of accessed Google service, and all activity logs

d.      The contents of all emails associated with the Accounts, including stored or preserved copies of emails sent to and from the Accounts, draft emails, and deleted emails; attachments; the source and destination addresses associated with each email; the size, length, and timestamp of each email; and true and accurate header information including the actual IP addresses of the sender and recipients of the emails. All forwarding or fetching accounts relating to the accounts;

e.      Any records pertaining to the user's contacts, including: address books; contact lists; social network links; groups, including Google Groups to which the user belongs or communicates with; user settings; and all associated logs and change history;

f.      Any records pertaining to the user's calendar(s), including: Google Calendar events; Google Tasks; reminders; appointments; invites; and goals; the sender and recipients of any event invitation, reminder, appointment, or task; user settings; and all associated logs and change history;

g.      The contents of all text, audio, and video messages associated with the Accounts, including Chat, Duo, Hangouts, Meet, and Messages (including SMS, MMS, and RCS), in any format and however initially transmitted, including, but not limited to: stored, deleted, and draft messages, including attachments and links; the source and destination addresses associated with each communication, including IP addresses; the size, length, and timestamp of each communication; user settings; and all associated logs, including access logs and change history;

h.      The contents of all records associated with the Accounts in Google Drive (including Docs, Sheets, Forms, and Slides) and Google Keep, including: files, folders, media, notes and note titles, lists, applications, and other data uploaded, created, stored, or shared with the account including drafts and deleted records; third-party application data and backups; SMS data and device backups; the creation and change history of each record; accounts with access to or which previously accessed each record; any location, device, other Google service (such as Google Classroom or Google Group), or third-party application associated with

each record; and all associated logs, including access logs and IP addresses, of each record;

i.    The contents of all media associated with the Accounts in Google Photos, including: photos, GIFs, videos, animations, collages, icons, or other data uploaded, created, stored, or shared with the account, including drafts and deleted records; accounts with access to or which previously accessed each record; any location, device, or third-party application data associated with each record; and all associated logs of each record, including the creation and change history, access logs, and IP addresses;

j.    All maps data associated with the account, including Google Maps and Google Trips, including: all saved, starred, and privately labeled locations; search history; routes begun; routes completed; mode of transit used for directions; My Maps data; accounts and identifiers receiving or sending Location Sharing information to the account; changes and edits to public places; and all associated logs, including IP addresses, location data, and timestamps, and change history;

k.    All Location History and Web & App Activity indicating the location at which the Accounts were active, including the source of the data, date and time, latitude and longitude, estimated accuracy, device and platform, inferences drawn from sensor data (such as whether a user was at rest, walking, biking, or in a car), and associated logs and user settings, including Timeline access logs and change and deletion history;

l.    All Internet search and browsing history, and application usage history, including Web & App Activity, Voice & Audio History, Google Assistant, and Google Home, including: search queries and clicks, including transcribed or recorded voice queries and Google Assistant responses; browsing history, including application usage; bookmarks; passwords; autofill information; alerts, subscriptions, and other automated searches, including associated notifications and creation dates; user settings; and all associated logs and change history;

m.    All activity relating to Google Play, including: downloaded, installed, purchased, used, and deleted applications, details of the associated device and Android ID for each application, medium, or file; payment transactions; user settings; and all associated logs, including IP addresses, timestamps, and change history;

n.    All Google Voice records associated with the account, including: forwarding and other associated telephone numbers, connection records; call detail records; SMS and MMS messages, including draft and deleted messages; voicemails, including deleted voicemails; user settings; and all associated logs, including access logs, IP addresses, location data, timestamps, and change history.

Google is hereby ordered to disclose the above information to the government within **14** days of issuance of this warrant.

**II.      Information to be seized by the government**

All information described above in Section I that constitutes evidence of violations of 18

U.S.C. § 922(g), those violations involving Christopher Michael Sanchez and occurring from

April 8, 2022 to April 20, 2022, including, for each Account or identifier listed on Attachment A,

information pertaining to the following matters:

a.      Transportation or travel in interstate commerce;

b.      Evidence indicating how and when the Accounts were accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

c.      Evidence indicating the geographic location of the Accounts at times relevant to the investigation;

d.      Evidence indicating the Account owner's state of mind as it relates to the crime under investigation;

e.      The identity of the person(s) who created or used the Accounts, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other

records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant.  The review of this electronic data may be conducted

by any government personnel assisting in the investigation, who may include, in addition to law

enforcement officers and agents, attorneys for the government, attorney support staff, and

technical experts.  Pursuant to this warrant, the FBI shall deliver a complete copy of the

disclosed electronic data to the custody and control of attorneys for the government and their

support staff for their independent review.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH FOR INFORMATION DESCRIBED IN ATTACHMENT A THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE LLC | Case No. 22-1901 MR<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Armida Maria Macmanus, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.       I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises owned, maintained, controlled, or operated by Google LLC ("Google"), an electronic communications service and/or remote computing service provider headquartered at 1600 Amphitheater Parkway, Mountain View, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.       I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since November 2005. During my career as an FBI agent, I have conducted criminal investigations regarding drug trafficking matters, white collar crimes, including public

corruption, violent crimes including kidnappings and threats made via interstate communications, and violations of the federal firearms laws of the United States. My experience as a Special Agent includes but is not limited to conducting physical surveillance; interviewing witnesses; writing affidavits for and executing search warrants; working with undercover agents and informants; serving administrative and federal grand jury subpoenas; analyzing financial records, telephone records, and data derived from the use of pen registers, trap and traces, and assisting in wiretap investigations. I have been the affiant for more than 50 federal search warrants, and I have participated in the execution of those and dozens of others. I have worked on several cases involving the search and seizure of electronic evidence on computers and other digital media. In particular, I have previously obtained other search warrants from Google seeking geolocation information and other data associated with user accounts. In addition, during this investigation, I have consulted with FBI Special Agent Sean Macmanus of the Cellular Analysis Survey Team, who has extensive experience in computer and electronic evidence.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that a violation of 18 U.S.C. § 922(g) has been committed by Christopher Michael Sanchez. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

**JURISDICTION**

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**RELEVANT STATUTE**

6.      18 U.S.C. § 922(g) makes it illegal to possess or receive a firearm or ammunition by a prohibited person.

**PROBABLE CAUSE**

7.      The Federal Bureau of Investigation ("FBI"), in Las Cruces, New Mexico (Dona Ana County), is investigating several shootings that took place in Las Cruces from on or about April 10, 2022, to April 17, 2022.  The FBI became aware of the shootings from local law enforcement and the United States Probation and Parole Office.  Christopher Michael Sanchez (herein Sanchez) is believed to have shot a firearm multiple times over several days and wounded at least two people.  Sanchez was under the supervision of the United States Probation and Parole Office at the time of the shootings.

8.      I reviewed an LCPD police report authored by Officer Johnny Estrada and learned the following information: On April 11, 2022, Officer Estrada was dispatched to 2811 North Main Street in Las Cruces (Mountain View Emergency Center at Main), in reference to a vehicle parked there with multiple gunshot holes in it. Once he arrived, Officer Estrada met with a witness (Witness 1) who said that he/she was driving near the Pic Quik Store (which is now a Circle K store) located at Sonoma Ranch Boulevard and Bataan Memorial East when a dark-

colored truck pulled up next to his/her car and its occupants began to mouth off to Witness 1 and his/her two passengers. As Witness 1 drove away, he/she heard gunshots, which he/she believed were being shot in the air. Witness 1's passenger (Victim 1), who was riding in the rear passenger-side seat, told Witness 1 he/she had been hit by gunfire. Witness 1 drove Victim 1 to get medical care. However, Victim 1 got upset, refused to receive medical care, and walked away from Witness 1. Officers were able to contact Victim 1 and asked him/her to get medical treatment. Victim 1 refused because, according to him/her, he/she had outstanding warrants. Officer Estrada later learned Victim 1 had been shot in the arm and leg. Officer Estrada contacted a relative of Victim 1, who informed him that the shooter was an individual who goes by the name "Scrappy" and drives a dark Nissan Altima. It is unknown how the relative obtained this information. I also learned that LCPD was able to obtain casings from the shooting.

9.      Victim 1 eventually went to Memorial Medical Center in Las Cruces to receive medical care. LCPD officers were able to interview Victim 1 there on April 11, 2022. I reviewed body camera footage of the interview from LCPD Officer Brian Gardea. From the video, I learned the following information: Three people, including Victim 1, were at the Circle K on April 10, 2022, at approximately 11:40 p.m. The driver (Witness 1), a front passenger, and Victim 1, who sat in the seat behind the passenger, were headed out of the Circle K parking lot when a dark colored vehicle, possibly a black or blue Nissan Altima, pulled up on Victim 1's side. Victim 1 heard Witness 1 ask the suspect vehicle's driver if he wanted to race. Immediately after, Victim 1 heard multiple shots fired from the suspect vehicle. Victim 1 saw two people in the suspect vehicle, the driver and one passenger. Victim 1 said he/she did not recognize them. However, Victim 1 heard the third passenger say that the shooter was

"Scrappy," a heavyset male who looked Chinese and had tattoos on his face. Victim 1 did not

see the firearms being shot but heard rounds being fired and soon realized he had been shot.

Victim 1 told Officer Gardea that Witness 1 did not fire at the suspects.

10.     On or about April 14, 2022, I spoke to an FBI Confidential Human Source (CHS)

who told me that on Sunday, April 10, 2022, at approximately 8:00 p.m., Sanchez and his

brother, First Name Unknown Last Name Unknown (FNU LNU), pointed two firearms,

including a rifle or AR-style firearm, at several people at a gas station on Paisano Drive in El

Paso, Texas. Sanchez and FNU LNU drove a dark gray Nissan Altima with tinted windows.

The FBI CHS provided telephone number (575) 644-1127 as belonging to Sanchez. The CHS

also provided (575) 636-9199 as possibly belonging to Sanchez' brother, FNU LNU.

11.     On or about April 14, 2022, I traveled to the Windstar Gasoline Station located at

311 West Paisano Drive in El Paso, Texas. I met with the store's personnel, who showed me

surveillance video dated April 10, 2022, at approximately 8:21 p.m. In the video, I observed a

silver-colored vehicle parked at one of the gas pumps and multiple occupants outside the vehicle.

I also observed a dark-colored gray sedan pull up to the adjacent gas pump. I observed two

subjects exit the sedan. I observed one subject holding his/her arm straight out with what

appeared to be a firearm in his/her hand. I also observed a second subject pointing what

appeared to be a rifle at the silver vehicle. I then saw both vehicles depart the gas station's

parking lot.





Page **6** of **27**

12.     On or about April 14, 2022, I contacted Jennifer Ramos, Senior U.S. Probation Officer, United States Probation Office, who confirmed that Sanchez was currently on federal supervised release.  Ramos also told me she had been in contact with officers from the LCPD due to allegations that Sanchez had been involved in a shooting in Las Cruces, New Mexico, over the weekend.  Sanchez was previously convicted of the felony offense of Conspiracy to Distribute 50 Grams and More of a Mixture and substance Containing a Detectable Amount of Methamphetamine, in violation of 21 U.S.C. 841(b)(1)(B).  *See United States v. Christopher Michael Sanchez*, 17-CR-01909 (D.N.M).  Sanchez began his term of federal supervised release on October 4, 2021.

13.     On or about April 15, 2022, Ramos provided me with Sanchez' primary contact phone number, (575) 644-1127.  On or about April 18, 2022, Ramos told me that Sanchez had provided her phone number (575) 636-9199 on April 1, 2022, as his contact number.

14.     I met with Victim 1 on or about September 29, 2022, at the FBI Las Cruces Resident Agency, 2509 North Telshor Blvd, in Las Cruces, to obtain a voluntary statement. Victim 1 provided additional details regarding the shooting that took place on or about April 10, 2022.  Victim 1, Witness 1 and a third passenger, were pulling out of the Circle K when a car pulled up next to them on the roadway.  Witness 1 yelled out to the suspect car if they wanted to race.  Victim 1, who was sitting behind the passenger seat, heard numerous gun shots, and soon realized he/she had been shot.  Victim 1 saw Witness 1 with a firearm but stated that instead of returning fire at the suspect vehicle, Witness 1 was firing the gun into the air.  As the suspect vehicle's occupants continued to fire rounds at Witness 1's vehicle, Witness 1 attempted to flee from the scene.  The suspect vehicle chased Witness 1's vehicle until they were finally able to get away from the suspect vehicle.  Victim 1 told me he did not remember the make and model

of the suspect vehicle. Initially, Victim 1 told me that he did not know who the shooters were.

However, after I showed him several pictures, Victim 1 identified the driver of the suspect

vehicle as "Crispin" (identified by law enforcement as Alfred "AJ" Marquez, who was known to

law enforcement as "Crispy"; Marquez died in Mexico on or about August 19, 2022). Both the

driver and passenger of the suspect vehicle were shooting at Witness 1's vehicle. Victim 1

claimed he/she did not recognize who the suspect passenger was.

15.    On or about Monday April 18, 2022, I received information from LCPD that

Sanchez was identified as a suspect in a shooting at the Kilby Motel, 1045 South Main Street,

Las Cruces, New Mexico, on or about April 17, 2022. I reviewed an LCPD report authored by

LCPD Sergeant Luis Balderrama and learned the following information: A witness (Witness 2)

told Balderrama that Sanchez, also known as Scrappy, showed up to the Kilby Motel intoxicated.

Sanchez started a fight with a male and pointed a firearm at him and shot one round. Witness 2

identified Sanchez as the shooter because Sanchez frequented the motel and Witness 2 was

familiar with Sanchez. Witness 2 told Balderrama that Sanchez drove to the motel in a black

Jeep with black tint.

16.    I reviewed an LCPD report authored by Officer Montoya and learned the

following information: On or about April 17, 2022, Officer Montoya responded to a shots-fired

call at the Kilby Motel. Officer Montoya had learned that at an earlier shots-fired call at the

Kilby Motel, the suspect drove a dark SUV and was armed with a handgun. As Officer Montoya

made his way to the Kilby Motel, he observed a black Dodge Nitro SUV, bearing New Mexico

license plate ANTG45. Officer Montoya and other responding officers attempted a high-risk

vehicle stop. The driver of the Dodge Nitro ignored the officers' commands and fled the scene at

a high rate of speed. Two .22 caliber shell casings were later recovered by LCPD at or near the location where the Dodge Nitro was parked at the Kilby Motel.

17.     On or about April 28, 2022, I spoke with LCPD Sergeant Miranda Baker who confirmed Christopher Sanchez is known by the moniker "Scrappy."

18.     On or about September 28, 2022, I received New Mexico vehicle registration records from the FBI Dispatch Center in Albuquerque, New Mexico. The records revealed that New Mexico license plate ANTG45 was registered to Martha Ann and Romen Gabriel Armijo and should be displayed on a Dodge Nitro SUV. An FBI analyst previously told me that Martha Ann Armijo is Sanchez' mother and Romen Gabriel Armijo is Sanchez' brother. Numerous vehicles are also registered to Martha Ann Armijo, including a Nissan Altima, bearing New Mexico license plate NWR246.

19.     On or about September 29, 2022, I received a photo from LCPD Detective Oscar Magallanes depicting a dark colored Nissan Altima bearing license plate NWR246. The Altima was parked at the Park Place Apartments, 3245 East University Avenue, in Las Cruces. The Altima appeared to be the same vehicle, equipped with the same type of tire rims, as the one depicted in the surveillance video from the Windstar Gas Station in El Paso on April 10, 2022.



20.     I reviewed an LCPD report authored by LCPD Officer Dalton Kinney which stated that on April 18, 2022, Officer Kinney responded to a dispatch call regarding a disturbance.  On his way there, Officer Kinney found a male (Victim 2) in the street near Valley and Main Street who was yelling and then collapsed.  Officers observed a large amount of blood on the male's shirt and determined he had been shot in the arm and injured in the back of his head. Officer Kinney assisted the male in obtaining medical care. Officers later attempted to obtain a statement from Victim 2.  However, Victim 2 refused to provide any information related to the shooter and refused to press charges.  Prior to responding to this call, Officer Kinney had also responded to a shots-fired call near 1045 Main Street.  The alleged shooter in this incident left the area in a black SUV.  Officers saw the alleged involved SUV, a black Dodge Nitro. However, the vehicle failed to yield to officers.

21.     I reviewed an LCPD report authored by Officer Johnny Estrada which stated that on or about April 18, 2022, Officer Estrada was dispatched to respond to an affray near 225

Desert Rose Court in Las Cruces.  Officer Estrada learned that a caller notified dispatch that they had heard three gunshots.  Officer Estrada observed a trail of blood, which he photographed.  He also located three shell casings located in front of 225 Desert Rose.  Officers received several calls throughout the night from persons who identified the shooter as Christopher Sanchez.

22.    I reviewed an LCPD report authored by Officer Luis Balderrama which stated that Officer Charli Velasco told him that a witness (Witness 3) told him that Chris Sanchez, a.k.a. Scrappy, arrived at his/her apartment and Witness 3 had observed Sanchez with a firearm. Sanchez placed the firearm on Witness 3's bed.  Witness 3 also said Victim 2 might be a friend of Sanchez'.

23.    I reviewed an LCPD report authored by Officer Charli Velasco which stated that Officer Velasco spoke with Witness 3 who told him Sanchez said, "the cops were already going after him and he had just run away from the cops."

24.    On or about September 20 and 21, 2022, I interviewed a witness (Witness 3) at the FBI Las Cruces Resident Agency.  During the voluntary interview, I learned the following: Witness 3 told me that on or about April 18, 2022, Sanchez arrived at his/her residence with another unknown male who goes by the name "Bandit."  Sanchez and Bandit arrived at the residence and were breathing heavily, as they had "just ran away from the cops and were in a high-speed chase."  Witness 3 and Sanchez walked inside his/her bedroom and Witness 3 observed Sanchez place a firearm on top of his/her bed.  Witness 3 described the firearm as having a brown wooden handle with a long barrel.  Witness 3 and Sanchez walked into the living room and Sanchez began talking to a female friend of Witness 3.  Witness 3 observed Sanchez attempt to strike his/her female friend with a glass bottle and then punch the female in the face. Witness 3 and the female ran out of the residence and hid nearby.  Witness 3 then heard a scuffle

ensue and banging on the walls. Witness 3 then heard Sanchez yell, "Where's my gun?" and three shots were fired. Witness 3 called the police.

25.     One or two days after the shooting, Marquez showed up at Witness 3's residence. He asked Witness 3 what he/she said to the police about the shooting and that he was there on behalf of Sanchez. Marquez referred to himself as Sanchez' "roll dog," a term Witness 3 understood as meaning that Marquez was Sanchez' side kick. Marquez told Witness 3 that he had been at the Kilby Motel with Sanchez to handle some things and that "Junebug" was beat up. Marquez warned Witness 3 to "watch out" and to be careful, as Sanchez does not "fuck around."

26.     A federal arrest warrant for Sanchez was issued by the Honorable Kevin R. Sweazea, United States Magistrate Judge, on or about April 18, 2022, for violation of his federal probation (see ECF Doc. 56, 2:17-CR-01909-MIS). On April 20, 2022, Sanchez was arrested without incident at the Super 8 motel in Las Cruces, located at 3405 Bataan Memorial West. At the time of arrest, Sanchez was found in possession of 5.5 grams of Fentanyl (approximately 50 pills) and five Suboxone strips. An arrest warrant was issued for Sanchez for Possession with Intent to Distribute Fentanyl in the 3rd Judicial District Court of New Mexico on April 20, 2022. An iPhone and tablet were seized from Sanchez at the time of his arrest.

27.     I reviewed a jail call obtained from the Dona Ana County Detention Center (DACDC) placed from an account named "Chris Sanchez" which was made on or about April 21, 2022. The caller, believed to be Sanchez, instructed Romen, Sanchez' brother, to return to the hotel and see if his cell phone was in there and that he didn't know if "they" searched the room. Based on my training and experience, I know that criminals use electronic devices such as cell phones and laptops to communicate with others engaging in criminal activity by placing phone calls either with cellular phone service or using various applications to place phone calls

via Wi-Fi connections to the internet.  I also know that drug traffickers use electronic devices to coordinate dates, times and locations to conduct exchanges of drugs for money or other things of value.

28.     During the same call, Sanchez asked Romen to look up "Google" to search the recent shootings in Las Cruces.  Romen told Sanchez that he could not find any recent news regarding shootings in Las Cruces.

29.     I reviewed a jail call obtained from the DACDC placed from an account named "Chris Sanchez" which was made on or about April 21, 2022.  The caller, believed to be Sanchez, spoke with a woman I believe is his mother.  The woman tells Sanchez that Romen, her son and Sanchez' brother, told her not to try to get Sanchez's cell phone.  The woman said she turned off the service on the phone.  Sanchez said that he "has a password on it" and that "they" can't open it even if they wanted to.  The woman said that it is probably "the better thing" that they can't get into it and that she thought Apple phones are harder to get into.  Based on my training and experience, I know that persons who are engaged in criminal activity attempt to conceal their communications using Apple products due to their perceived security features.

30.     On April 29, 2022, a federal search warrant was issued by U.S. Magistrate Judge Stephan M. Vidmar (case 22-706-MR) in the U.S. District of New Mexico to search an Apple iPhone and tablet to obtain evidence of drug trafficking and violations of 18 U.S.C. § 922(g).  An attempt was made to search both devices.  Some records were retrieved from the tablet.  A search of the iPhone was not possible due to the phone's security features.

31.     On or about October 4, 2022, FBI SA Sean Macmanus reviewed Verizon records obtained via a state search warrant (3rd Judicial District of New Mexico, issued by District Court Judge Jessica Streeter on August 12, 2022, and filed on August 24, 2022).  FBI SA Sean

Macmanus learned that phone number (575) 636-9199 was listed under the same Verizon account subscribed to by Martha Armijo (Sanchez' mother).   Under the same account, telephone number (575) 644-1127 was also listed.

32.     On October 19, 2022, a federal search warrant for Verizon records associated with the (575) 636-9199 was issued in the U.S. District Court of New Mexico by U.S. Magistrate Judge Gregory J. Fouratt.  The search warrant was served on October 21, 2022, and the requested records were received by the FBI on or about October 27, 2022.  A preliminary review of those records by FBI SA Sean Macmanus revealed location information from a device assigned (575) 636-9199 was consistent with location information provided by an FBI CHS, witnesses and victims identified in this investigation.  The device showed location information in El Paso, Texas on April 10, 2022, in Las Cruces near the Circle K at the time of the shooting on April 10, 2022, and three shootings on or about April 17, 2022, in the areas of the Kilby Motel and the apartments on Desert Rose in Las Cruces.

33.     During the arrest of Sanchez on April 20, 2022, federal agents and law enforcement officers located two electronic devices that belonged to Sanchez, including an Apple iPhone.  I know that Sanchez spoke of his seized iPhone during a recorded jail call with his mother after his arrest.

34.     On or about April 22, 2022, I served a preservation letter to Google for records associated with telephone numbers (575) 644-1127 and (575) 636-9199 for records from April 8, 2022, to April 22, 2022, in anticipation of legal process being sought for additional records, including content, in the future.

35.     On December 13, 2022, a federal search warrant was issued by U.S. Magistrate Judge Stephan M. Vidmar (case 22-1844-MR) in the U.S. District of New Mexico to search

Google records associated with phone numbers (575) 644-1127 and (575) 636-9199. On or about December 14, 2022, Google notified your affiant via electronic mail that no Google records had been located that were associated with the two aforementioned phone numbers.

36.     On December 21, 2022, I spoke with Federal Probation Officer Ramos who advised me she located Gmail address sanchezchris2626@gmail.com listed by the author of a Human Services application dated October 6, 2021. The application references Sanchez.

37.     I also reviewed Verizon phone records previously obtained in this case which revealed IMEI 355541825974466 was assigned to an Apple iPhone. Additionally, on or about May 2, 2022, SA Sean Macmanus located IMEI 355541825974466 on the iPhone seized from Sanchez on the day of his arrest.

38.     On December 21, 2022, I spoke with SA Sean Macmanus regarding Google account records. SA Sean Macmanus told me Google maintains their records via Gmail accounts and do not always maintain up-to-date phone numbers assigned to cellular phones used to access Google accounts. Therefore, it is possible that phone numbers, such as those used by Sanchez, may not be part of the records Google maintains.

39.     I know from experience that Google can conduct a search of Google account records by using a device's assigned IMEI serial number. Therefore, I am requesting Google records associated with sanchezchris2626@gmail.com, IMEI 355541825974466 (the IMEI assigned to an iPhone seized from Sanchez), and IMEI 35554182597446X, with X representing any digit from 0 to 9. According to SA Sean Macmanus, the International Mobile Equipment Identifier (IMEI) is a unique identifier for a physical mobile device. The IMEI consists of 14 unique digits and a "check digit" at the end, which are assigned to the device when it is manufactured. The check digit is determined by a known mathematical formula. However,

sometimes companies, including Google, change or record the "check digit" in their records as a 0 or another number from 0 to 9. Therefore, your affiant is requesting that Google also search their records for the IMEI with all possible "check digits" (0-9) to ensure that the records are located.

40.     This information, including potential geolocation records stemming from Google account activity for the times period specified in Attachment B, is likely to constitute evidence of the crime under investigation that could corroborate or refute claims made by the Victims and/or the Witnesses. The location information from Google can be analyzed to determine the general area phones were in at certain dates and times. Additionally, the location information could verify that Sanchez traveled interstate.

## BACKGROUND CONCERNING GOOGLE[1]

41.     The background information set forth below is based on my own personal knowledge and/or information learned from FBI Special Agent Sean Macmanus of the Cellular Analysis Survey Team, who, as noted above, has extensive experience in computer and electronic evidence.

42.     Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser

---

[1] The information in this section is based on information published by Google on its public websites, including, but not limited to, the following webpages: the "Google legal policy and products" page available to registered law enforcement at lers.google.com; product pages on support.google.com; or product pages on about.google.com.

called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

43.     In addition, Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

44.     Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account.  Google advertises its services as "One Account. All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below.

45.     Google provides email services (called Gmail) to Google Accounts through email addresses at gmail.com or enterprise email addresses hosted by Google. Gmail can be accessed through a web browser or a mobile application. Additional email addresses ("recovery," "secondary," "forwarding," or "alternate" email addresses) can be associated with the Google Account by the user. Google preserves emails associated with a Google Account indefinitely, unless the user deletes them.

46.     Google provides an address book for Google Accounts through Google Contacts. Google Contacts stores contacts the user affirmatively adds to the address book, as well as contacts the user has interacted with in Google products. Google Contacts can store up to 25,000 contacts. Users can send messages to more than one contact at a time by manually creating a group within Google Contacts or communicate with an email distribution list called a Google Group. Users have the option to sync their Android mobile phone or device address book with their account so it is stored in Google Contacts. Google preserves contacts indefinitely, unless the user deletes them. Contacts can be accessed from the same browser window as other Google products like Gmail and Calendar.

47.     Google provides an appointment book for Google Accounts through Google Calendar, which can be accessed through a browser or mobile application. Users can create events or RSVP to events created by others in Google Calendar. Google Calendar can be set to generate reminder emails or alarms about events or tasks, repeat events at specified intervals, track RSVPs, and auto-schedule appointments to complete periodic goals (like running three times a week). A single Google Account can set up multiple calendars. An entire calendar can be shared with other Google Accounts by the user or made public so anyone can access it. Users have the option to sync their mobile phone or device calendar, so it is stored in Google Calendar. Google preserves appointments indefinitely, unless the user deletes them. Calendar can be accessed from the same browser window as other Google products like Gmail and Calendar.

48.     Google provides, or has provided in the past, several messaging services including Duo, Messages, Hangouts, Meet, and Chat. These services enable real-time text, voice, and/or video communications through browsers and mobile applications, and also allow users to send and receive text messages, videos, photos, locations, links, and contacts. Google may retain

a user's messages if the user hasn't disabled that feature or deleted the messages, though other factors may also impact retention. Google does not retain Duo voice calls, though it may retain video or voicemail messages.

49.     Google Drive is a cloud storage service automatically created for each Google Account. Users can store an unlimited number of documents created by Google productivity applications like Google Docs (Google's word processor), Google Sheets (Google's spreadsheet program), Google Forms (Google's web form service), and Google Slides, (Google's presentation program). Users can also upload files to Google Drive, including photos, videos, PDFs, and text documents, until they hit the storage limit. Users can set up their personal computer or mobile phone to automatically back up files to their Google Drive Account. Each user gets 15 gigabytes of space for free on servers controlled by Google and may purchase more through a subscription plan called Google One.  In addition, Google Drive allows users to share their stored files and documents with up to 100 people and grant those with access the ability to edit or comment. Google maintains a record of who made changes when to documents edited in Google productivity applications. Documents shared with a user are saved in their Google Drive in a folder called "Shared with me." Google preserves files stored in Google Drive indefinitely, unless the user deletes them.

50.     Google Keep is a cloud-based notetaking service that lets users take notes and share them with other Google users to view, edit, or comment. Google Keep notes are stored indefinitely, unless the user deletes them.

51.     Google offers a cloud-based photo and video storage service called Google Photos. Users can share or receive photos and videos with others. Google Photos can be trained to recognize individuals, places, and objects in photos and videos and automatically tag them for

easy retrieval via a search bar. Users have the option to sync their mobile phone or device photos to Google Photos. Google preserves files stored in Google Photos indefinitely, unless the user deletes them.

52.     Google offers a map service called Google Maps which can be searched for addresses or points of interest. Google Maps can provide users with turn-by-turn directions from one location to another using a range of transportation options (driving, biking, walking, etc.) and real-time traffic updates. Users can share their real-time location with others through Google Maps by using the Location Sharing feature. And users can find and plan an itinerary using Google Trips. A Google Account is not required to use Google Maps, but if users log into their Google Account while using Google Maps, they can save locations to their account, keep a history of their Google Maps searches, and create personalized maps using Google My Maps. Google stores Maps data indefinitely, unless the user deletes it.

53.     Google collects and retains data about the location at which Google Account services are accessed from any mobile device, as well as the periodic location of Android devices while they are in use. This location data can derive from a range of sources, including GPS data, Wi-Fi access points, cell-site locations, geolocation of IP addresses, sensor data, user searches, and Bluetooth beacons within range of the device. According to Google, this location data may be associated with the Google Account signed-in or registered to the device when Location Services are activated on the device and the user has enabled certain global settings for their Google Account, such as Location History or Web & App Activity tracking.  The data retained may be both precision location data, like latitude and longitude coordinates derived from GPS, and inferential location data, such as the inference that a Google Account is in New York because it conducts a series of searches about places to eat in New York and directions from one

New York location to another. Precision location data is typically stored by Google in an account's Location History and is assigned a latitude-longitude coordinate with a display radius in meters. The display radius is Google's estimate of the area the device was in at the date and time the data was recorded. The latitude-longitude provided is simply the center of the radius circle provided. Inferential data is stored with an account's Web & App Activity. Google maintains these records indefinitely for accounts created before June 2020, unless the user deletes it or opts to automatically delete their Location History and Web & App Activity after three or eighteen months. Accounts created after June 2020 auto-delete Location History after eighteen months unless the user affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

54.     Google offers a free web browser service called Google Chrome which facilitates access to the Internet. Chrome retains a record of a user's browsing history and allows users to save favorite sites as bookmarks for easy access. If a user is logged into their Google Account on Chrome and has the appropriate settings enabled, their browsing history, bookmarks, and other browser settings may be saved to their Google Account in a record called My Activity.

55.     My Activity also collects and retains data about searches that users conduct within their own Google Account or using the Google Search service while logged into their Google Account, including voice queries made to the Google artificial intelligence-powered virtual assistant Google Assistant or commands made to Google Home products. Google also has the capacity to track the websites visited using its Google Chrome web browser service, applications used by Android users, ads clicked, and the use of Google applications by iPhone users. According to Google, this search, browsing, and application use history may be associated with a Google Account when the user is logged into their Google Account on the browser or device and

certain global settings are enabled, such as Web & App Activity. Google Assistant and Google Home voice queries and commands may also be associated with the account if certain global settings are enabled, such as Voice & Audio Activity tracking. Google maintains these records indefinitely for accounts created before June 2020, unless the user deletes them or opts into automatic deletion of their location history every three or eighteen months. Accounts created after June 2020 auto-delete Web & App Activity after eighteen months unless the user affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

56.     Google Accounts can buy electronic media, like books, movies, and music, and mobile applications from the Google Play Store. Google Play records can include records of whether a particular application has been or is currently installed on a device. Users cannot delete records of Google Play transactions without deleting their entire Google Account.

57.     Google offers a service called Google Voice through which a Google Account can be assigned a telephone number that can be used to make, record, and forward phone calls and send, receive, store, and forward SMS and MMS messages from a web browser, mobile phone, or landline. Google Voice also includes a voicemail service. Records are stored indefinitely, unless the user deletes them.

58.     Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Google Hangout, Meet, and Chat conversations pop up within the same browser window as Gmail. Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive. If

someone shares a document with a Google Account user in Google Docs, the contact

information for that individual will be saved in the user's Google Contacts. Google Voice

voicemail transcripts and missed call notifications can be sent to a user's Gmail account. And if a

user logs into their Google Account on the Chrome browser, their subsequent Chrome browser

and Google Search activity is associated with that Google Account, depending on user settings.

59.     When individuals register with Google for a Google Account, Google asks users

to provide certain personal identifying information, including the user's full name, telephone

number, birthday, and gender. If a user is paying for services, the user must also provide a

physical address and means and source of payment.

60.     Google typically retains and can provide certain transactional information about

the creation and use of each account on its system. Google captures the date on which the

account was created, the length of service, log-in times and durations, the types of services

utilized by the Google Account, the status of the account (including whether the account is

inactive or closed), the methods used to connect to the account (such as logging into the account

via Google's website or using a mobile application), details about the devices used to access the

account, and other log files that reflect usage of the account. In addition, Google keeps records of

the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of

service, as well as the IP addresses associated with particular logins to the account. Because

every device that connects to the Internet must use an IP address, IP address information can

help to identify which computers or other devices were used to access the Google Account.

61.     Google maintains the communications, files, and associated records for each

service used by a Google Account on servers under its control. Even after a user deletes a

communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

62.     I know that Google sometimes maintains records regarding the location of phones and other electronic devices used to access Google.  I know that in crimes of violence, subjects and victims commonly carry a cellular phone on their person or in their vehicle.  Those phones can easily access Google.  For example, during a jail call made by Sanchez after his arrest, he asked his brother to "Google" recent shootings in Las Cruces.

63.     I believe Google possesses location information that could provide additional information of the whereabouts of Sanchez during the alleged crimes.  This information for the time period specified in Attachment B, is likely to constitute evidence of the crime under investigation that could corroborate or refute claims made by FBI CHSs, victims and witnesses.  The location information from Google can be analyzed to determine the general area phones were in at certain dates and times.  Additionally, the location information could verify that Sanchez traveled interstate on or about April 10, 2022.

64.     In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.  For example, in this case, location information will help the FBI determine Sanchez' whereabouts at various points in time and, more specifically, whether he was at locations consistent with statements provided by informants, victims and witnesses.

65.     Based on my training and experience, messages, emails, voicemails, photos, videos, documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offense under investigation.  Thus, stored communications and files connected to a Google Account may provide direct evidence of the offense under investigation.  I believe Sanchez' Google account(s) will contain additional and more precise location information of his cell phone's whereabouts during the crimes.

66.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date, and time) may be evidence of who used or controlled the account at a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account.  Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

67.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.,* information indicating a

plan to commit a crime), or consciousness of guilt (*e.g.,* deleting account information to conceal evidence from law enforcement).

68.     Therefore, Google's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Google services.  In my training and experience, such information may constitute evidence of the crime under investigation including information that can be used to identify the account's user or users.

69.     Based upon the information contained in this Affidavit, there is probable cause to believe that Google records associated with the Gmail address and/or IMEI numbers provided in Attachment A, contain evidence of a violation of 18 U.S.C. § 922(g).

[Continued on next page…]

## CONCLUSION

70.     Based on the foregoing, I request that the Court issue the proposed search warrant.

71.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

72.     The government will execute this warrant by serving the warrant on Google. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

73.     Assistant United States Attorney Eliot Neal has reviewed and approved this application.

Respectfully submitted,

ARMIDA MARIA MACMANUS
Special Agent
Federal Bureau of Investigation

Sworn telephonically, signed remotely, and transmitted by email on _12-22-2022_,

HONORABLE KEVIN R. SWEAZEA
UNITED STATES MAGISTRATE JUDGE